This was an interesting trial in that I got to learn about what a stack is and how you can use officers to do these types of raids. One of the things I'm not going to be focusing on today is whether or not the officers saw the plaintiff behind the door. The court ruled against me on that. What I'm solely focusing on today is what I believe is the fact that the door was not locked and it was never checked by any officers prior to the time that it was rammed. If you look at the officer's testimony, Officer Gruber testified that he was not sure whether the door was checked to see if it was locked. He said that he saw Troy, the husband, inside and he heard Sergeant Cardwell give the order to deploy the ram. Then there's Officer Bandy, who was the ram, and he said that after Cardwell knocked, some of the officers behind him saw Troy inside the house. And Officer Bandy, who would have been in the best position of any officer to see Cardwell check the door, because he's right there in front of it and his job is to sit there with the ram and focus on that door and ram it, said he did not recall seeing Cardwell check the door. And again, he heard that people behind him said that they saw Troy and he heard Cardwell give the order to ram. Also, Bandy also testified that he didn't notice any damage to the dead bolt or the door jamb. And he went on to say that if the door was locked and he rammed it, there would be some damage. Then there's Officer Prochaska, and he prepared one of the reports, and it's interesting to note that nowhere in the report does it ever state that anyone checked the door to see if it was locked. They also didn't put in the report whether or not there was any damage to the door. And then there's Officer Bandis. And Officer Bandis testifies that it was Cardwell's decision, it was his obligation to check the door, it was Cardwell's decision to deploy the ram, and it never testified that Cardwell checked it. What this leaves is a gaping hole on the issue of whether or not this door was ever checked to see if it was locked. There's certainly no direct testimony that it was done. You've got Officer Bandy, who I think is in the best position of anybody, to see whether or not Cardwell checked the door, and he testified he didn't recall. And I think that what all this equates to is the fact that Cardwell did not check the door. Cardwell didn't testify, did he? He did not testify. So there's a complete black hole here of whether or not what I view as a critical issue as to whether or not he did. So based on the evidence, there was evidence that we have from photographs that the door, that there wasn't damage to the frame or the deadbolt. My client certainly testified to that, that it wasn't damaged in that regard. Also, if you look at kind of the way this happened, the door, so much force was hit on this door that it flew into my client and pushed her backwards, and she fell over a chair and suffered a horrific injury. Basically, her rib cage fractured, and the part of the rib that was fractured went up into her lung and punctured a hole in her lung. That takes a lot of force to do that. I submit that, you know, if the door was locked, it wouldn't have flown open so hard to force her back and to have this type of an injury. So at the end of the day, I think that an inference that the court can make here is that the door was unlocked and it was never checked. The factors that I think that the court could use that was, number one, Bandy, who was in the best position to see it, said he didn't recall seeing it happen. Isn't the issue really whether when they knocked, the door was open? Whether or not the plaintiff was opening the door? After the knock, did the door open? By my client. My client's testimony was that she was in the process of opening the door, and in trial, the trial judge, she found against me on that. And my whole position on appeal is that let's assume that the police officer's version is more credible than my client's version. Do they have to use the doorknob if the door isn't opening? Do they have to? They don't. I agree with that. They all testified that there's no need to ram a door that's either unlocked or a door that's in the process of being opened. So I concur with that. But let's say it's unlocked. Do they have to use the doorknob? Ram it? Yeah. That's an excessive use of force. I think it's an excessive use of force to ram an unlocked door because it doesn't take anything to open it. And there's no need for it. Why would you need to ram a door? There's a risk of harm when you ram a door like this that it's going to fly into somebody or hurt someone. And I'll get into that later. There's the factors that I spell out from the Seventh Circuit case on why I believe all the factors point to it's an excessive use of force to ram the door. But from an evidentiary standpoint, I think that the only inferences that the trial court could make on this key issue of why it was locked are all against the defendants in this. Another thing is it became, obviously, after what happened to the plaintiff, such an important point that I submit that if Cardinal had fact-checked it and it was locked, it would have showed up in their report. It seems to me that after they sat down and wrote their reports, this is something of such a significance that it should have shown up in their reports and it didn't. My clients testified that the door wasn't locked. The testimony, which is unrefuted, is my clients that were sitting down there watching TV. It's an afternoon. It's a sunny day. And I think that because of that, that's an inference that the court can't make. Is it also unrefuted that the officer saw somebody moving towards the door? That's exactly true. And I think that's the inference that should be made is that because they saw a toy in my client's husband, they saw him. And it's like, oh, there's a guy. And then they saw him go back to the back and they knew from before that the pot plants were in the back. They felt they were compromised. And Cardinal gave the order to deploy the ram. Could they have felt they were in danger? There's no evidence to that. They had not had any contact with these people. I think there's dueling risks of harm to the occupants and to the officers on either side of the door. Yes. And the person with the control is the person inside that can respond and open the door. And my client's testimony was that they did that in a quick fashion. And she was in the process of opening the door. We know she was behind the door when it got rammed. The officers said that they didn't have any idea of that. But she had to have been behind the door. Otherwise, she wouldn't have been injured. And so we know that she ended up behind there. But the point is that there's still no need to ram an unlocked door. All you have to do is open it and go in. And then everybody goes in. So I think that when you go about doing this, and there's a case involving a flashbang, where the officers took a flashbang device and just threw it in. And, of course, it landed on a sofa next to somebody, and it caused a pretty horrific injury. And the court in that case said that there's no need to do that sort of thing unless you have some specific information that there's going to be a risk of harm with that. And I think that what happened in this case is they saw Troy, they saw him leave, and then they gave the order to ram. And my client was right behind the door when he got rammed and suffered a horrific injury. The factors in this case all point to this being an excessive use of force. The police had never had any contact with my clients. There was no evidence that they were armed. The search warrant was obtained because it appeared the husband was growing pot plants in the back of the house. The family was sitting watching TV. They didn't appear to be disruptive or anything. And the crime is probably a misdemeanor at best. And they had no history of there being any criminal activity here or any weapons in this house. And to do this, I think, is a complete excessive use of force in this matter. And they all testified themselves that you don't need to ram an unlocked door. Instead of ramming it, why didn't they just open it and then they would have gained access that way also. And so really, because I'm really focusing on that, I think that the inferences that the court could make based on the evidence is, the only inference that can be made, there's a huge black hole here, is that the door was in fact unlocked. And I don't think that she could have, the trial judge really could make an inference on this. Now, the court seemed to take some significance of habit evidence, where the defendants testified that, well, we always check when we do these raids. But the problem with that is that there's no evidence that Cardwell was the pride on any of these prior raids. There's also a lack of evidence, of habit evidence, of Cardwell being the pride. There's nothing that says how he did it in any way, shape, or form. Asking them, well, yeah, we always follow it, is the same as asking them, well, do you use excessive force when you go on these raids? And they're going to say, well, no, we don't. And I don't think that really, that type of evidence overcomes what I view as a gaping hole here. When everything's looked at, everything, the lack of damage to the door, and if it had been locked, there should have been damage to it. The fact that the officer that was closest to it doesn't recall Officer Cardwell even checking it, all leads to the inescapable conclusion that the door was not locked, it wasn't checked, it was rammed, and ramming it was an excessive use of force. Why didn't you call Officer Cardwell? I didn't, I wasn't going to call him. I don't need to call him, and his testimony was barred for failing to disclose him as a witness. Are there any other questions? I think we have five minutes for rebuttal. Thank you. Ms. Kuchar? May it please the Court, Mary Kuchar is for the defendants. There are four in this case, Officer Tom Bannis, Officer Bandy, Officer Gruber, and Officer Prochaska. So all four of these officers were present at this particular incident. And I don't see a gaping hole, or a gaping hole, or any type of hole. There's no denying that the door was rammed. The officers all admitted the door was rammed. The ram was used. Officer Bandy used the ram, and he explained how he used the ram. He used the ram because the door was locked. No one opened the door. They never saw the door not open. They never saw daylight. And how is it that there was no destruction at all to the door jam? The officers, they were asked that, and they said they can't explain. Every door is different. Officer Bandy testified in the trial where he rams it. He aims for one particular spot. And I have no idea. The door could have been not a secure door, not a heavy door. As he testified, every door is different. But he did admit he rammed that door, and that door opened. Now, the testimony of the individuals inside that house differ. First, the door is unlocked. Then we have the door being opened two inches and seeing sunlight. That's what the injured party in this case says. Though she's behind the door, then she's able to see when she opens the door, standing to see sunlight. And the officers were asked that. And the officer with the shield, Prochaska, said if that door was open, she wouldn't be seeing an officer. She'd be seeing a shield. Because as soon as that door knob opens, as soon as a door starts to be open, the ram is out of the way, and I jump in to protect my other officers. I'm the one who takes the hit, meaning they don't know what the hit is. It could be a gun. It could be whatever. But the shield steps in. You're not seeing faces. You're seeing a shield. She didn't testify to that. She saw sunlight and several officers when she opened up the door. So we go from the door being first the door, the individuals inside saying the door's unlocked, then we have the door being opened, then she's saying she made it two seconds over to the door and was able to open this. Again, the trial judge found that it was incredible. It was incredible. The officers knocked and announced and waited at least ten seconds. During that ten seconds, no one said anything. Absolutely no one inside the house called out, said, we're here, we're coming to the door. They did see an individual go to the back. They saw an individual, a male, stand up and make eye contact with the police and go to the back of the house. But still, still, all four testified and they were consistent that they waited ten seconds before they rammed that door, before they went in. Again, not knowing who else was inside that house, not knowing that that could have been the only individual in that house. They didn't see her. She didn't yell out. They didn't see the son.  No one said a word. No one said a word. The door frame was not damaged. Was the face of the door damaged? The ram would strike by the door knob. So this door had glass, like a little glass window, with some sort of scarecrow type hanging in front of it. And the glass is not going to be broken. It was a small piece of glass. Officer Bandy, who carries the ram and uses the ram on raids, said, I have one focus and that's to ram the door by the door knob to open up that door. The ram, it hardened up the door or break the wood? No, he didn't break the door knob. He opened the door. And was she behind the door? She hadn't been behind the door. She was injured. They found her on the floor when they opened up. Why she was behind the door, we don't know. We can't, you know. But she was behind the door. She would have been behind the door if they opened the door. Because she didn't say anything. She didn't say, I'm behind the door. I'm coming to open the door. I'm here. There's people inside the house. If the door was open, if you put her behind the door and the door was unlocked and they went in, they're not going to open the door like you or I do going into a house quietly. They're going to pry the door open again. She would have been behind the door. So she was behind the door. Why she was behind the door, we don't know. Though she says later on that she wasn't, she was standing in such a way that she could see outside when the door was open. But the officers testified that they lined up in the stack, they knocked, they announced, and they waited 10 seconds. Not excessive force when a door is locked and you have to use a ram. Not excessive at all. And the trial judge found that their behavior, or I should say their actions of waiting those 10 seconds prior to using the ram is consistent with other cases where the officers knock and announce and know that the door is locked and no one has responded to open up the door in this particular case. So there were four officers left in this trial, and all four testified that they were very consistent in the steps and the procedures they take when they come to these raids. And Officer Bandy did testify, the one who had the ram. He testified that it was highly impossible that Sergeant Cardwell did not check and see if the door was locked. Every single one said, we have a responsibility here. That wasn't our responsibility, but it is so impossible that Sergeant Cardwell did not, that he forgot to do that because that was his job. My job is the ram. My job is the shield. That's like saying, I do the shield, but I forgot my shield back in the squad car. They're not going to happen. They show up to do a job, and they each have a particular job to do in the stack that they're positioned in. And the other officers also testified that these are the steps we take. Knock, announce, check. Because if a door is open, they are going to go in. And every single one said, if the door is unlocked, we're going to go in. And it's not going to be the ram first. It's going to be the shield. The door is going to be open, and the shield is going in. The ram steps off to the side. So Bandy said, I'm not even going in. I probably will go in maybe at the end if they need me, but I don't go in. If the door is open, my job is done. I'm holding this big ram. I step to the side. And Prochaska said, if that door is open and Cardwell or whoever is checking an unlocked door opens that door to go in, I'm right there. Not even the person who opens the door is not going in. I'm going in first, and that's who they're seeing first. So they have these procedures for safety. So if a door is open, the ram is not. There's a reason to use the ram. And the ram, the holder of the ram is not going in. The shield takes the hit, and the shield is going in. And that, in this particular case, the knock and announce, the door was checked, and the ram was used. Once the ram was used, Bandy said, I step to the side. Again, Prochaska said, I go in. My focus is, again, to go in. And they all said, then they saw her behind the, on the floor. And did they know she was behind the door? No. So making these assumptions that they had to know, they should have known, I don't know how they could have known. They didn't see her. She said she didn't make eye contact with any of the officers. She never told them where she was. So it's an assumption. Again, they can say now, well, she must have been behind there, but she got hurt. But they're not going to know that on the scene. And as the trial judge said, 2020. So not hindsight. Not saying, oh, I should have known, or that's how I should have perceived it back when I was standing there. Not at all. Not at all. They didn't know. They didn't know where she was. So was it excessive force? Not excessive force. Not excessive force. Using a ram is not excessive. Yes, this woman was behind the door. Yes, the door hit her. But it wasn't excessive for those officers to use that ram to get into this particular house. Again, would it have been easier for the individuals inside the house just to open up the door? Of course. Why they didn't? Again, we don't know. Would it have been easier for them to yell out, coming to the door, going to open it, people inside? It would have been. Would have been. And the officers all testified that even though individuals say that, sometimes they don't open up the door and they know there's people in there, but they still have to use the ram because the door is locked. So these officers who all testified that this wasn't their first raid, this wasn't their first raid. They talked about hundreds. Randy talked about hundreds of raids and using the ram. So they each had a job, and that job was done. And at the end of the day, the door had to be rammed. Not announce, check the door to see if it was open, and the ram had to be used because the door was locked. These are assumptions to say that we assumed that the door was open. We assumed that it was because the plaintiff said that I saw sunlight. Again, these are all assumptions based on someone who the trial judge said did not have credible testimony. So again, the officers there to do a job stood in front of that door in what they call the positioning that is normal for a staff, and not announce, open the door, and then went inside. And for those reasons, Your Honor, we argue that it was not excessive force. The actions of all four of these officers, each one individual or their job. And they each had a job to do, and on that particular day, they did their job. They made entrance into that house. So therefore, we ask that you uphold the trial judge's findings, unless there's any questions. Thank you. Well, I might be more inclined to agree with Ms. Kuchar's if we had some evidence that the door in this case was actually locked. And there's just not. If it was in their police report, when they wrote the report, it's my burden. I have the burden of proof. And the point is, is that they keep going on about, well, it was locked because we rammed it. Well, that doesn't really prove anything. Were they given a command to ram the door? Yes. Who gave that command? Cardwell. And why was that command unfounded? Why was that unfounded? I believe that he saw Troy and decided to ram the door before he checked, before it was checked to see if it was open. Did you prove that he didn't check it to see if it was unlocked? Well, again, I have evidence that if the door would have been locked, there would have been damage to the door. Bandy admitted that. And everybody admits there was no damage to the door. Do you think it was unreasonable for the four officers to ram the door based on the command their supervisor gave them? Yes. So they were each required to check the door before they rammed it? It was required to be checked, yes. By all four officers? Before it's rammed, it has to be checked. They all testified that you do not ram an unlocked door. And it's undisputed, all four of those men agreed. They testified truthfully that they didn't check the door. They did not check the door. But how do we know that Cardwell didn't? Because there's no evidence of it whatsoever. It's not in a police report. Bandy, whose sole job is to focus on that door with a ram, said he didn't recall. Is there a way to prove that Cardwell did not check that door? Well, if they could have called him, they would have probably, you know, I don't know what he would have said. He was never disclosed. We had no idea what he was going to say. Justice O'Brien asked you why you didn't call him to establish that really relevant fact. I chose not to. I chose to bar his testimony because they wasn't disclosing me. And it was a decision that I made at trial. And so what we have is other circumstantial evidence that shows if the door was locked, there would have been some damage to it. And there's no damage. So I believe the door was unlocked, that Cardwell gave the order in a rush before he checked it. And the other thing is, you know, what do they really think Pleniff was doing behind the door? She testified that she was in the process of unlocking it. I don't know what. She could have been holding the door? She could have been holding the door for the. The gentleman that was walking towards the back of the house to get a few steps farther away? You know, the testimony, her testimony, was that she was in the process of opening the door. I don't see any reason to question that. It would seem to make sense that, you know, if she was watching TV, there's a knock, it's the police, she gets up. I don't see any reason to assume anything other than the fact that she would be getting up to open the door. And, you know, and clearly she was. And Prochaska, the first thing that he saw of her, she's laying down on the floor. So given everything, I think there's a complete. If they had some evidence that the door was locked and it was checked, I might agree with them on this. But, unfortunately, the way things worked out, there's not. There's not a police report, no one testified to it. And given the fact that we got pictures of the door that should show, if it was locked, it should show evidence of there being damage to it, that's an inference that the trial court could not make. And based on that, I'm asking to reverse. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement. The written decision will be issued to you right now. We will take a short recess for lunch. Reconvene at lunch. Oh, perfect. I learned my lesson long ago. Thank you.